IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| CHICAGO TITLE INSURANCE COMPANY, | ) |
| | ) |
| Plaintiff, | ) CIVIL ACTION NO.: |
| | ) JUDGE |
| vs. | ) MAGISTRATE |
| | ) |
| DEWRELL SACKS, LLP, and | ) |
| MARA SACKS, | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

Plaintiff brings its Complaint against the Defendants for damages as follows:

### PARTIES

1. Plaintiff Chicago Title Insurance Company (hereinafter "Chicago") is a corporation incorporated under the laws of the State of Missouri, that is authorized to conduct business within the State of Tennessee.

2. Defendant Dewrell Sacks, LLP (hereinafter "D&S") is a Georgia limited liability partnership with its principal place of business in Atlanta, Georgia. It can properly be served with summons and Complaint upon either of its principals, Tracey Dewrell or Mara Sacks.

3. Upon information and belief, Defendant Mara Sacks is a citizen and resident of Atlanta, Georgia.

### JURISDICTION AND VENUE

4. This Court possesses jurisdiction over this matter pursuant to 28 U.S.C. §1332 and venue is proper under 28 U.S.C. §1391.

1

5. The amount in controversy in this matter, exclusive of interest and costs, exceeds the sum of $75,000.00.

## FACTS

6. From 2002 to 2004, Chicago and D&S entered into three separate Issuing Agency Contracts (hereinafter referred to collectively as the "Agency Contracts").

7. Specifically, on November 11, 2002, Chicago and D&S entered into an Issuing Agency Contract (see Exhibit A, the "First Agency Contract," including subsequent amendments), whereby Chicago agreed to permit D&S to countersign and issue title insurance commitments, endorsements, and title insurance policies on behalf of Chicago in the State of Georgia.

8. On December 30, 2003, Chicago and D&S entered into a second Issuing Agency Contract (see Exhibit B, the "Second Agency Contract") whereby Chicago agreed to permit D&S to countersign and issue title insurance commitments, endorsements, and title insurance policies on behalf of Chicago for specific counties located in the State of Tennessee.

9. On February 12, 2004, Chicago and D&S entered into a third Issuing Agency Contract (see Exhibit C, the "Third Agency Contract"), whereby Chicago agreed to permit D&S to countersign and issue title insurance commitments, endorsements, and title insurance policies on behalf of Chicago in the State of Florida.

10. The Agency Contracts required D&S to comply with specific conditions. Specifically, D&S agreed to receive and process applications for insurance in a timely, prudent and ethical manner with due regard to recognized title insurance underwriting practices and in accordance with the rules and instructions of Chicago. D&S also agreed not to commit Chicago

2

to a risk which is based upon a disputed title. D&S also agreed to prepare, maintain and preserve a file for each application of title insurance, including all supporting documents which enable D&S to issue such insurance, title to which was vested in Chicago.

11. In the Agency Contracts, D&S agreed to indemnify and save Chicago harmless for all attorney's fees, court costs, expenses and loss resulting from (a) omissions or other inaccuracies in any commitment or policy which are disclosed by the application, the approved examiner's report, or which were known to the Agent; (b) errors and/ or omissions in the abstracting or examination of title by D&S or D&S's employees and/ or subcontractors; (c) failure of D&S, its officers or employees to comply with the terms of the Agency Contracts or with the rules, regulations or instructions given to D&S by Chicago; and (d) any improper closing or attempted closing by D&S, including but not limited to loss or misapplication of documents or other things of value entrusted to D&S in any custodial or fiduciary capacity resulting in loss to Chicago.

12. Mara Sacks signed a Personal Guaranty, agreeing to guaranty the full and faithful performance of the terms and obligations of D&S under the Agency Contracts. See Exhibit D.

13. By agreement of the parties, D&S has been terminated as an authorized title agent for Chicago. See Collective Exhibit E.

### FRANKLIN, TENNESSEE

14. Upon information and belief, D&S conducted on September 9, 2004 a real estate closing involving real property located at 601 Huffine Manor Circle, Franklin, Tennessee (the "Franklin Real Property"). The transaction involved recording a deed of trust (the "Franklin Insured Lender's DOT") dated September 9, 2004 from Jill Ann Gauci (the "Franklin

3

Borrower"), securing an original principal indebtedness of $158,00000, for the benefit of Ameriquest Mortgage Company (the "Franklin Insured Lender").

15. In Tennessee, liens against real property must be recorded quickly or otherwise potentially lose priority in securing an indebtedness.

16. D&S delayed recording the Franklin Insured Lender's DOT with the Register's Office until February 7, 2005.

17. Upon information and belief, D&S issued on August 31, 2004 a loan policy of title insurance (the "Franklin Loan Policy") insuring the Franklin Insured Lender's DOT as a lien against the Franklin Real Property. In the Franklin Loan Policy, D&S obligated Chicago to insure the Franklin Insured Lender against loss or damage sustained by the Franklin Insured Lender by reason of any defect in or lien or encumbrance on the title.

18. On or about March 8, 2005, the Franklin Borrower filed a Chapter 7 bankruptcy petition.

19. As a result of the delay of D&S in recording the Franklin Insured Lender's DOT after the closing and advancement of funds, the Franklin Insured Lender lacked a valid exception to the Chapter 7 Trustee's powers to avoid the recording of the Franklin Insured Lender's DOT as a preferential transfer. Therefore, the Trustee determined that the Franklin Insured Lender's DOT was not properly perfected and the Franklin Real Property was sold free and clear of any liens in the bankruptcy proceeding.

20. In June of 2006, Fidelity paid $158,000 to the Franklin Insured Lender in compliance with its obligations in the Franklin Loan Policy. Chicago subsequently took assignment of the Franklin Insured Lender's DOT, and retained counsel to defend Chicago's

4

interests in the bankruptcy proceeding. The bankruptcy trustee paid Chicago $109,427.99. However, Chicago still has a loss of $48,572.01 plus $15,854.35 in expenses for which it is seeking recoupment from D&S.

## SMITHVILLE, TENNESSEE

21. Upon information and belief, D&S conducted a real estate closing (hereinafter the "Smithville Closing") on or about May 17, 2004 involving real property located at 473 Oaks Drive, Smithville, Tennessee (hereinafter the "Smithville Real Property").

22. In that transaction, Joe Wayne Hill (hereinafter the "Smithville Borrower") borrowed $187,000 from Ameriquest Mortgage Company (hereinafter the "Smithville Insured Lender").

23. To secure that indebtedness, the Smithville Borrower executed a deed of trust (hereinafter the "Smithville Insured Lender's DOT") with the Smithville Insured Lender as beneficiary.

24. In performing its title search in relation to the Smithville Closing, D&S failed to discover and/or disclose and/ or attach to the Smithville Insured Lender's DOT a complete legal description of the Smithville Real Property. Specifically, D&S failed to comply with its responsibility to describe in the Smithville Insured Lender's DOT a full and complete parcel of the land intended to be conveyed.

25. On May 17, 2004, D&S issued a Final Mortgage Title Policy (hereinafter the "Smithville Loan Policy"), insuring the Smithville Insured Lender's DOT as a first priority lien against only a portion rather than the complete description of the Smithville Real Property. In the Loan Policy, D&S obligated Chicago to insure the Smithville Insured Lender against loss or

5

damage sustained by it by reason of any defect in or lien or encumbrance on the title to only a portion of the Smithville Real Property. D&S failed to comply with its responsibility to include a complete legal description of the Smithville Real Property in the Smithville Loan Policy.

26. On or about February 7, 2007, Chicago notified D&S that it had received notice of a potential claim with respect to the Smithville Real Property and requested that D&S forward a copy of the complete original title file to Chicago so that Chicago could investigate the matter. Upon information and belief, D&S failed to comply with that request.

27. Because D&S failed to discover and/or disclose and/ or attach to the Smithville Insured Lender's DOT a complete legal description of the Smithville Real Property, because D&S failed to describe fully the Smithville Real Property in the Smithville Loan Policy, and otherwise failed to remit a complete copy of the original title file to permit Chicago to investigate fully the matter, Chicago, in order to discharge its obligations under the Smithville Loan Policy, paid $4,000 on or about March 22, 2007 for a portion of the legal expenses associated with correcting the legal description to the Smithville Real Property.

## DAYTON, TENNESSEE

28. Upon information and belief, D&S was involved in a real estate closing that took place on January 24, 2004 involving real property located at 3197 Market Street, Dayton, Tennessee (the "Dayton Real Property"). The transaction involved recording a Deed of Trust (the "Dayton Insured Lender's DOT") dated January 24, 2004 from Joshua H. Rhodes and Brandy N. Rhodes to (the "Dayton Borrowers"), securing an original principal indebtedness of $77,440, for the benefit of Ameriquest Mortgage Company (the "Dayton Insured Lender").

29. On or about September 16, 2004, the Dayton Borrowers filed separate chapter 7

6

and 13 bankruptcy petitions.

30. The Dayton Insured Lender's DOT was not recorded with the Register's Office for Rhea County, Tennessee until October 20, 2004.

31. After the recording of the Dayton Insured Lender's DOT on October 20, 2004, D&S prepared a loan policy of title insurance (the "Dayton Loan Policy") insuring the Dayton Insured Lender's DOT as a first priority lien against the Dayton Real Property. In the Dayton Loan Policy, D&S obligated Chicago to insure the Dayton Insured Lender against loss or damage sustained by the Dayton Insured Lender by reason of any defect in or lien or encumbrance on the title. D&S backdated the issuance of the Dayton Loan Policy to January 24, 2004.

32. As a result of the delay in recording the Dayton Insured Lender's DOT after the closing and advancement of funds, and after the Borrowers had filed for bankruptcy, the Dayton Insured Lender lacked a valid exception to each of the Trustees' powers to avoid the Dayton Insured Lender's DOT as valid lien against the Dayton Real Property. In addition, the Trustee in the Chapter 13 case determined that the belated attempt to perfect the Dayton Insured Lender's DOT was an unauthorized transfer of the Dayton Real Property, in violation of the automatic stay.

33. In October of 2005, Chicago paid $10,000 to the Chapter 13 Trustee, care of the Dayton Insured Lender, in compliance with its obligations in the Dayton Loan Policy.

## JAMESTOWN, TENNESSEE

34. On or about May 31, 2004, D&S conducted a real estate closing (the "Jamestown Closing") involving real property located at 518 Flat Spur Road, Jamestown, Tennessee (the "Jamestown Real Property").

7

35. In that transaction, Priscilla Cooper (the "Jamestown Borrower") obtained a loan from Ameriquest Mortgage Company (the "Jamestown Insured Lender").

36. To secure that indebtedness, the Jamestown Borrower executed a deed of trust (the "Jamestown Insured Lender's DOT") with the Jamestown Insured Lender as beneficiary.

37. In performing its title search in relation to the Jamestown Closing, D&S discovered but failed to disclose or otherwise payoff or secure the release of a prior deed of trust recorded September 11, 2002 in favor of Union Bank of Jamestown, Tennessee ("Union Bank"), recorded in Book 34, Page 33, Register's Office for Fentress County, Tennessee (the "Union Bank DOT"). Specifically, D&S admitted to Chicago that it had misinterpreted a letter dated May 25, 2004 from Union Bank by concluding that the Union Bank DOT had been paid off when, in fact, it had not.

38. Because D&S failed to subordinate, disclose or otherwise payoff or secure the release of the Union Bank DOT, it remained outstanding as a senior lien against the Jamestown Real Property.

39. On May 24, 2004, D&S issued a Final Mortgage Title Policy (the "Jamestown Loan Policy"), insuring the Jamestown Insured Lender's DOT as a first priority lien against the Jamestown Real Property. In the Jamestown Loan Policy, D&S obligated Chicago to insure the Jamestown Insured Lender against loss or damage sustained by it by reason of any defect in or lien or encumbrance on the title. In the Jamestown Loan Policy, D&S did not list the Jamestown Insured Lender's DOT as an exception to coverage.

40. The foreclosure of the Union Bank DOT extinguished the security interest provided by the Jamestown Insured Lender's DOT.

41.     On January 17, 2006, the Jamestown Insured Lender brought this matter to Chicago's attention and demanded that Chicago satisfy its obligations under the Jamestown Loan Policy.

42.     As a result of D&S's failure to disclose or otherwise payoff or secure the release of the Union Bank DOT, Chicago, on or about April 5, 2007, paid the Jamestown Insured Lender policy limits of $81,000 to settle the matter.

## COUNT I
## BREACH OF CONTRACT

43.     Among D&S's duties under the Agency Agreements were the duties to receive and process applications for insurance in a timely, prudent and ethical manner with due regard to recognized title insurance underwriting practices and in accordance with the rules and instructions of Chicago; the duty not to commit Chicago to a risk which is based upon a disputed title; the duty to prepare, maintain and preserve a file for each application of title insurance, including all supporting documents which enable D&S to issue such insurance, title to which was vested in Chicago; and the duty to indemnify and save Chicago harmless for all attorney's fees, court costs, expenses and loss resulting from (a) omissions or other inaccuracies in any commitment or policy which are disclosed by the application, the approved examiner's report, or which were known to the Agent; (b) errors and/ or omissions in the abstracting or examination of title by D&S or D&S's employees and/ or subcontractors; (c) failure of D&S, its officers or employees to comply with the terms of the Agency Contracts or with the rules, regulations or instructions given to D&S by Chicago; and (d) any improper closing or attempted closing by D&S, including but not limited to loss or misapplication of documents or other things of value

9

entrusted to D&S in any custodial or fiduciary capacity resulting in loss to Chicago.

44. D&S failed to comply with these duties by its failure to record and/ or confirm the recording of the Franklin Insured Lender's DOT and Dayton Insured Lender's DOT in a timely manner; failure to discover and/or disclose and/ or attach to the Smithville Insured Lender's DOT and the Smithville Loan Policy a complete legal description of the Smithville Real Property; failure to disclose, subordinate, payoff, secure the release of or list as an exception to coverage under the Jamestown Loan Policy the Union Bank DOT; failure to remit a complete copy of its original title files to permit Chicago to investigate fully these matters; and its failure to reimburse Chicago for its payments, attorney's fees and expenses related to these losses.

45. D&S's actions and omissions by its failure to record and/ or confirm the recording of the Franklin Insured Lender's DOT and Dayton Insured Lender's DOT in a timely manner; failure to discover and/or disclose and/ or attach to the Smithville Insured Lender's DOT and the Smithville Loan Policy a complete legal description of the Smithville Real Property; failure to disclose, subordinate, payoff, secure the release of or list as an exception to coverage under the Jamestown Loan Policy the Union Bank DOT; failure to remit a complete copy of its original title files to permit Chicago to investigate fully these matters; and its failure to reimburse Chicago for its payments, attorney's fees and expenses related to these losses failed to conform with recognized title insurance underwriting practices and the rules and instructions of Chicago.

## COUNT II
## NEGLIGENCE

46. In addition to its duties under the Agency Agreements, D&S also had a duty to record and/ or confirm the recording of documents in a timely manner; to include complete

10

property descriptions in its deeds of trusts and title policies; to disclose, subordinate, or otherwise payoff or secure the release of prior deeds of trust, to perform reasonable, thorough and careful searches of all records affecting the real properties which were the subject of closing transactions it conducted as an agent for Chicago, and to reimburse Chicago for its losses and attorneys' fees.

47. D&S breached those duties by its failure to record and/ or confirm the recording of documents in a timely manner; failure to discover and/or disclose and/ or attach to documents complete descriptions of property; failure to disclose, subordinate, payoff, secure the release of or list as an exception to coverage preexisting liens under policies of title insurance; failure to remit a complete copy of its original title files to permit Chicago to investigate fully claims; and its failure to reimburse Chicago for its payments, attorney's fees and expenses related to these losses.

48. As a direct and proximate result of D&S's breach of its duties, Chicago's insured lenders' liens were either invalid as first priority liens against the real properties, or were relegated to junior positions and did not encumber all of the properties intended to be encumbered and insured.

49. As a direct and proximate result of D&S's breach of its duties, Chicago incurred damages, including payments as required by the policies of title insurance issued by D&S and expenses and attorneys' fees.

WHEREFORE, Chicago demands the following:

1. That service of process issue and be served upon D&S, causing it to plead or answer this Complaint, or same will be taken for confessed or proceeded upon ex parte;

2. That Chicago be awarded a judgment for compensatory damages sufficient to

compensate Chicago for its damages and prejudgment interest thereon at the highest rate allowed by law;

3. That Chicago be awarded its reasonable attorney's fees;

4. That the costs of this action be awarded to Chicago; and

5. For such further and other general relief to which Chicago may be entitled.

*[signature]*
John Cobb Rochford (#18867)
Jeff P. Goodson (#23648)
Law Office of John Cobb Rochford, PLLC
2200 Abbott Martin Road, # 201
Nashville, TN 37215
(615) 269-7676

Attorneys for Plaintiff