IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **CHICAGO TITLE INSURANCE COMPANY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:08-1083** |
| | ) | **Judge Trauger** |
| **DEWRELL SACKS, LLP.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM

Pending before the court is the plaintiff's Motion for Summary Judgment (Docket No. 17) and the defendant's [Partial] Motion for Summary Judgment Dismissing Plaintiff's Allegations of Professional Negligence Based Upon the Expiration of the Statute of Limitations (Docket No. 25). For the reasons discussed herein, the plaintiff's motion will be granted in part and denied in part, and the defendant's motion will be granted.

## FACTUAL AND PROCEDURAL BACKGROUND

The parties in this case are both involved in the title insurance industry.[1] The plaintiff, Chicago Title Insurance Company ("Chicago Title"), is a large title insurance company that does

---

[1]Unless otherwise noted, the facts are drawn from the parties' statements of material facts (Docket Nos. 18, 25 (Exhibit 1), 28 (Exhibits 1 and 2), 30, and 34) and related affidavits and exhibits. Although facts are drawn from submissions made by both parties, on a motion for summary judgment, all inferences are drawn in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

1

business throughout the country.  The defendant, Dewrell Sacks, LLP ("DS") is a law firm that is organized as a Limited Liability Partnership under the laws of Georgia.  (Docket No. 1 at 1.)  At all relevant times, DS was an authorized "title agent" or "real estate closing agent" for Chicago Title.

On December 30, 2003, the parties entered into an Issuing Agency Contract (the "Agency Contract") whereby Chicago Title permitted DS to countersign and issue title insurance commitments, endorsements, and title insurance policies on behalf of Chicago Title for specific counties in Tennessee.  In addition, the Agency Contract imposed a series of duties on DS, most notably to "receive and process applications for title insurance in a timely, prudent and ethical manner with due regard to recognized title insurance underwriting practices and in accordance with the rules and instructions of [Chicago Title]."  (Docket No. 1 Ex. B at 1.)  Additionally, DS agreed to "be liable to and [] to indemnify and to save harmless [Chicago Title] for all attorney's fees, court costs, expenses and loss or aggregate of losses resulting from . . . failures of [DS] to comply with the terms of this contract or with the rules, regulations or instructions given to [DS] by [Chicago Title]."  (*Id.* at 1-2.)

This dispute concerns four otherwise unrelated residential real estate transactions in different cities/towns in Tennessee in which, pursuant to the Agency Contract, DS operated as the "title agent" or the "real estate closing agent" for Chicago Title.  Ameriquest Mortgage Company ("Ameriquest") was the buyer's lender for each transaction.

First, the "Franklin Closing" took place on September 9, 2004 and involved a $158,000 deed of trust from the borrower for the benefit of Ameriquest.  On September 14, 2004,

Ameriquest's closing instructions, which included the instruction "Record Enclosed Document[] . . . Deed of Trust" in the "First Position" were delivered to DS, although it is not clear from the record whether the deed of trust was actually provided along with the instructions. (Docket No. 22 Ex. 2.) DS did not record Ameriquest's deed of trust with the Registrar's Office until February 7, 2005. In conjunction with the "Franklin Closing," DS also issued a title insurance policy to Ameriquest in Chicago Title's name, insuring Ameriquest against, among other things, loss or damage sustained by Ameriquest by reason of "any defect in or lien or encumbrance on the title." (Docket No. 22 Ex. 4 at 1.)

The borrower in the Franklin Closing filed for Chapter 7 Bankruptcy on March 8, 2005, 29 days after the deed of trust was recorded. (Docket No. 22 Ex. 5.) As a result of the close temporal connection between the recording of the deed of trust and the bankruptcy filing, the Trustee was able to request that the deed of trust be deemed avoidable as a "preferential transfer" under the Bankruptcy Code. (*Id.*) According to Chicago Title, this request was granted, and, therefore, the Trustee was able to sell the Franklin property free and clear of the Ameriquest deed of trust. Shortly thereafter, Ameriquest filed a title insurance claim with Chicago Title, and, as of October 12, 2005, Chicago Title began inquiring with DS about the issues surrounding the recording of this deed of trust.

On June 9, 2006, Chicago Title paid Ameriquest $158,000 pursuant to the title policy that DS had issued in Chicago Title's name. Chicago Title subsequently took assignment of the deed of trust and was able to recover $109,427.99 in the bankruptcy proceeding. Chicago Title still claims, however, a loss of $48,572.01 plus $15,854.35 in expenses resulting from the delay in

recording the deed of trust, and Chicago Title places the responsibility for the delay on DS. Additionally, repeated requests and demands by Chicago Title directed to DS for compensation have not been fruitful.

Second, the "Smithville Closing" took place on May 17, 2004. This transaction, like the Franklin Closing, also involved (1) a loan from Ameriquest to a borrower in a residential real estate transaction, (2) a deed of trust, with Ameriquest as the beneficiary, and (3) a Chicago Title title insurance policy that was issued by DS in conjunction with the closing that insured Ameriquest against loss or damage sustained by it by reason of "any defect in or lien or encumbrance on the title." (Docket No. 22 Ex. 12 at 1.) The problem in this instance, however, was that the legal description of the Smithville property, as stated in the title policy, failed to include a substantial piece of land that had been transferred to the borrower/buyer in the underlying sale of the property.

Through a February 7, 2007 letter to DS, Chicago Title claimed that it had received notice of a claim from Ameriquest under the Smithville title policy related to the land description defect. (Docket No. 22 Ex. 13.) Chicago Title claims that, while it received no support from DS in this matter, "in order to discharge its obligations under the Smithville Loan Policy, [it] paid $4,000 on or about March 23, 2007 for a portion of the legal expenses associated with correcting the legal description to the Smithville Real Property." (Docket No. 28 Ex. 1 at 17-18.) Chicago Title provides correspondence and a cancelled check indicating that such payment was made, and DS does not challenge the validity of those documents. (Docket No. 22 Ex. 14.) Likewise, there is no dispute that this $4,000 payment was made to an attorney (not retained by Chicago Title) for

4

legal services performed to resolve the land description issue. Chicago Title also contends that its subsequent demands for reimbursement from DS have not been successful.

Third, the "Dayton Closing" took place on January 24, 2004. This transaction had the same basic structure in terms of the Ameriquest loan, the deed of trust, and the Chicago Title/DS title policy as the above transactions. The issue here, as with the "Franklin Closing," involved a purported delay in the recording of the deed of trust. Just as in the Franklin Closing, Chicago Title contends that DS received closing instructions from Ameriquest that, among other things, included the instruction to "Record Enclosed Document[] . . . Deed of Trust" in the "First Position." In contrast to the Franklin Closing, however, the plaintiff has not filed a copy of the closing instructions that indicates when those instructions were submitted to DS. (*See* Docket No. 22 Ex. 18.) The deed of trust for the Dayton property was not recorded until October 20, 2004.

Chicago Title claims that, during this intervening period, on September 16, 2004, the borrowers in the Dayton Closing filed for bankruptcy protection under both Chapter 7 and Chapter 13. Chicago Title also claims that, as the result of the delay in recording, the bankruptcy Trustee in the Chapter 7 proceeding was, just as with the Franklin property, able to avoid the deed of trust as a valid lien against the property. Additionally, Chicago Title claims that the Trustee in the Chapter 13 case determined that the belated attempt to perfect the deed of trust was an unauthorized transfer of the property in violation of the automatic stay.

Chicago Title contends that it received a title insurance claim from Ameriquest, and that, on June 3, 2005, Chicago Title began inquiring with DS about the recording issues, without much

5

success.  In October 2005, Chicago Title, as the result of negotiations with the bankruptcy

Trustees, paid $10,000 to the Chapter 13 Trustee, care of Ameriquest, for the Trustee to waive

any interest in the Dayton Property and thereby resolve the dispute that had arisen in the

Bankruptcy Court.  (Docket No. 31 Ex. 1 at 145-146.)  Chicago Title claims that further, repeated

efforts to recoup money from DS have been unsuccessful.

Fourth, and finally, the "Jamestown Closing" occurred on May 31, 2004, with, again,

Ameriquest operating as the lender, a deed of trust being issued, and DS issuing a title insurance

policy to Ameriquest on behalf of Chicago Title, in conjunction with the closing.  The issue here

involves a previous deed of trust that was recorded as to the Jamestown property on September

11, 2002.  Indeed, there is no dispute that, prior to the Jamestown Closing, there were two deeds

of trust on this property, and one of these liens was not paid off by DS prior to the closing, and no

exception for this lien was indicated on the title policy.

Also, Chicago Title has provided the court with a few documents that indicate that the

problematic lien was apparent in the title records prior to the Jamestown Closing.  For instance, a

May 7, 2004 "Summary of Title" prepared by a "Title Abstractor" shows both liens, as does

Ameriquest's April 30, 2004 "Request for Title."  (Docket No. 22 Exs. 28-29.)  Additionally,

Chicago Title has provided a February 14, 2006 e-mail from Valerie Hulsey at DS to a

representative from Chicago Title's parent company that indicates that the second deed of trust

was not paid off prior to the Jamestown Closing because a DS "paralegal" had "misinterpreted" a

letter received prior to closing, wrongly interpreting that letter to mean that the second deed of

trust had already been paid off.  (*Id.* Ex. 30.)

As the lien was not paid off prior to closing, the September 11, 2002 deed of trust remained the senior lien on the property.  Chicago Title further alleges that, when that deed of trust was foreclosed upon some time after the Jamestown Closing, Ameriquest's deed of trust was extinguished.  In January 2006, Ameriquest made a title insurance claim to Chicago Title as to the Jamestown Property, and, shortly thereafter, on January 24, 2006, Chicago Title first brought this matter to the attention of DS.   On April 6, 2007, Chicago Title paid Ameriquest $81,000, the policy limit, to settle the matter.  Despite repeated requests, DS has not paid Chicago Title any compensation in this matter.

As will be discussed below, DS's primary defense in this case, at least as to the Dayton and Franklin closings, is that Chicago Title, DS, and Ameriquest all had an understanding that explains the delays in the recording of those deeds of trust and shows that the delays were Ameriquest's responsibility.  Both parties recognize that real estate closings for Ameriquest "were handled differently" than for other lenders who received policies from Chicago Title, and this was done with the full knowledge, understanding, and tacit consent of Chicago Title. (Docket No. 30 at 17-19.)  Specifically, for transactions in which Chicago Title was the insuring agent, Ameriquest was permitted to meet with borrowers at the closing and secure the execution of the closing documents, such as the deed of trust.  In such instances, it was Ameriquest who was responsible for conveying these instruments of title to DS for review and recording.  As discussed below, DS claims that this practice explains and justifies its delays in recording, and Chicago Title disagrees.

Also, as will be discussed below, DS claims that it is owed at least $33,374.36 by Chicago

Title in the form of rebates for DS's "special handling" of the Ameriquest account on behalf of Chicago Title. (Docket No. 30 at 13, 23.) While Chicago Title denies that it owes DS anything, it acknowledges that Chicago Title and DS had a "special contractual arrangement concerning premiums that were written for title insurance that was issued to . . . Ameriquest." (*Id.* at 12.) This arrangement allowed for "a different rate" to be paid to DS by Chicago Title for Ameriquest policies obtained by DS because of the "large amount of revenue generated for Chicago Title by Ameriquest." (*Id.* at 13, 17.)

The plaintiff filed the Complaint in this matter on November 7, 2008, asserting two claims: (1) breach of contract and (2) negligence. (Docket No. 1.) Discovery has been conducted, and the plaintiff has moved for summary judgment. The defendant has moved for partial summary judgment, seeking a dismissal of the negligence claim as time-barred.

## ANALYSIS

The plaintiff, primarily, alleges that the defendant breached their 2003 Agency Contract on four occasions by either (1) unreasonably delaying the recording of deeds of trust, (2) improperly omitting material from a property description or (3) not properly addressing a prior lien on a property. The plaintiff has moved for summary judgment on its contract claims, and the defendant has responded with various defenses. The plaintiff, in its Complaint, also asserted a claim for negligence that is not addressed in the plaintiff's Motion for Summary Judgment. The defendant has, however, moved for summary judgment on this claim on statute of limitations grounds.

## I.     Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the non-moving party fails to make a sufficient showing on an essential element of the case with respect to which she has the burden, however, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To preclude summary judgment, the non-moving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be

evidence on which the jury could reasonably find for the [non-moving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the non-moving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the non-moving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 431 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49).

## II.    The Plaintiff's Claims

### A.    The Negligence Claim

In its Partial Motion for Summary Judgment, the defendant seeks to dismiss the plaintiff's negligence claim as time-barred. (*See generally* Docket No. 26.) Specifically, DS argues that, because the Complaint allegations implicate the professional competence of the attorneys at DS, the negligence cause of action is governed by T.C.A. § 28-3-104(a)(2), which provides for a one-year statute of limitations on claims of malpractice by attorneys and other legal professionals, whether those claims are stated under tort or contract law. (Docket No. 26 at 7 citing T.C.A. § 28-3-104(a)(2)). The statute of limitations commences in accordance with the "discovery rule," that is, the cause of action is deemed to accrue when the plaintiff knows or, in the exercise of reasonable diligence, should know that the injury at issue was caused by the defendant's wrongful conduct. *See John Kohl & Co. PC v. Dearborn & Ewing*, 977 S.W. 2d 528, 532 (Tenn. 1998).

DS argues that because, as indicated above, Chicago Title was aware of the title issues with these properties no later than early 2007, its negligence claim, asserted in late 2008, is time-

barred. (Docket No. 26 at 7-8, 14-16.) Alternatively, the plaintiff argues that, if the court finds

that the allegations as to the negligence claim do not implicate the legal malpractice statute of

limitations, the negligence claims as to the Franklin and Dayton closings are still time-barred

under the only "other statute of limitations which arguably could apply to Plaintiff's negligence

claim," which is the three-year statute of limitations codified in T.C.A. § 28-3-105 for "property

tort actions." (*Id.* at 13-15)(noting, as discussed above, that Chicago Title was aware of

problems with the Franklin property no later than October 12, 2005 and of problems with the

Dayton property no later than June 3, 2005).

Outside of the statute of limitations issues, there are other reasons for dismissal of the

negligence claim. Most notably, the plaintiff, while not expressly stating so, appears to have

essentially abandoned the claim. Indeed, the plaintiff filed a Motion for Summary Judgment that

does not provide any support for the negligence claim; indeed, outside of the word being used in

an unrelated case quotation, "negligence" is not mentioned anywhere in the plaintiff's Motion or

briefing in support. (Docket Nos. 17, 19, and 29.) From this briefing, and from the plaintiff's

response to the defendant's Partial Motion for Summary Judgment, it is clear that the plaintiff's

case against DS has become one based exclusively upon a breach of contract theory. (*See*

Docket No. 33 at 1)("while the Defendant . . . assert[s] that Chicago's claims sound in tort,

Chicago seeks indemnification from the Defendant, pursuant to the terms and conditions

contained in the Agency Contract.")

Also, the plaintiff's response to the defendant's motion largely relies on cases that

indicate that the plaintiff has a valid breach of contract claim but not a valid negligence claim.

For instance, the plaintiff cites this court's decision in *Fidelity National Title Ins. Co. v. Archer Land Title, LLC*, 2007 WL 3231847, *4 (M.D. Tenn. Oct. 30, 2007) for the proposition that, "where a title insurance underwriter seeks indemnification from its closing agent under a written agency contract . . . the gravamen of the plaintiff's tort claims lies in contract." (Docket No. 33 at 1.) Indeed, in that case, the court determined that, because "the key issue that the plaintiff must prove to establish any of its claims is whether the defendant failed to act in accordance with prudent underwriting principles in breach of the Agreement," the gravamen of the Complaint was contract and no distinct tort claims were validly stated. *Fidelity*, 2007 WL 3231847, at *4.

The plaintiff also cites, at length, the Tennessee Court of Appeals opinion in *Ticor Title Ins. Co. v. Smith*, 794 S.W. 2d 734, 735-38 (Tenn. Ct. App. 1990), in which the court determined that an attorney/closing agent could not invoke the one-year legal malpractice statute of limitations as a defense to a breach of agency contract claim, because the closing agent was not operating as an attorney but, instead, was operating as an "agent to write title insurance, pursuant to specific terms and conditions contained in the Agency Contract." (Docket No. 33 at 4-6 citing *Ticor*, 794 S.W.3d at 736-38.) In short, the plaintiff's response to the defendant's motion is a diligent effort to preserve its breach of contract claim, and this is further evidence that the plaintiff appears to have essentially abandoned the negligence claim.[2]

Even if that were not that the case, the negligence claim should still be dismissed. In

_____

[2]The plaintiff does go on to briefly argue that, "to the extent this Court should find that Chicago's claims sound in tort," at least the claims as to the three of the properties (Franklin, Smithville, and Jamestown) would not be barred by the three-year statute of limitations discussed by DS because the plaintiff paid the claims, that is, suffered an injury, on those properties less than three years prior to filing suit. (Docket No. 33 at 6-8.)

asserting this claim, the Complaint states that DS had certain "duties" outside of the Agency Contract. (Docket No. 1 at 10-11.) Those duties are stated as: "to record and/or confirm the recording of documents in a timely manner; to include complete property descriptions in its deeds of trusts and title policies; to disclose, subordinate, or otherwise payoff or secure the release of prior deeds of trust, to perform reasonable, thorough and careful searches of all records affecting the real properties which were the subject of closing transactions it conducted as an agent for Chicago, and to reimburse Chicago for its losses and attorneys' fees." (Docket No. 1 at 10-11.) Clearly, however, this is simply another way of stating the Agency Contract obligations (1) to "receive and process applications for title insurance in a timely, prudent and ethical manner with due regard to recognized title insurance underwriting practices and in accordance with the rules and instructions of [Chicago Title]" and (2) to "be liable to and [] to indemnify and to save harmless [Chicago Title] for all attorney's fees, court costs, expenses and loss or aggregate of losses resulting from . . . failures of [DS] to comply with the terms of this contract or with the rules, regulations or instructions given to [DS] by [Chicago Title]." (Docket No. 1 Ex. B at 1-2.)

Therefore, the supposed additional tort "duties" are indistinct from the obligations imposed by the Agency Contract, and, just as in *Fidelity*, "no distinct tort claims [are] stated." *Fidelity*, 2007 WL 3231847, at *4. Indeed, the only basis on which an independent duty could arise here would be in the context of professional malpractice, which is a theory that the plaintiff has disclaimed, and, as the defendant correctly argues, any professional malpractice claims would be time-barred. Therefore, the negligence claim will be dismissed.

**B.     Breach of Contract Claim**

The three essential elements of a breach of contract claim in Tennessee are well established: (1) the existence of an enforceable contract; (2) nonperformance amounting to a breach; and (3) damages caused by the breach.  *Ingram v. Cendant Mobility Fin. Corp.*, 215 S.W.3d 367, 374 (Tenn. Ct. App. 2006).  Here, there is no dispute that an enforceable agreement, the Agency Contract, exists between the parties and no dispute that Chicago Title had to pay money to resolve a series of title defects.  Indeed, the remaining issue for purposes of this analysis is whether DS's conduct as to each of the four properties amounts to a breach of the Agency Contract.[3]

---

[3] The defendant also argues that the "plaintiff's Motion for Summary Judgment should be denied because it fails to defeat the affirmative defense of insufficiency of process." (Docket No. 28 at 21.)  The defendant argues, supported by the declaration of Mara Sacks Dewrell (attorney and DS partner), that the individual who signed the certified mail receipt for the plaintiff's summons and Complaint is unknown to DS and "was not authorized to accept service and was not an employee of Defendant." (*Id.*; Docket No. 28 Ex. 3 at 2.)  She also claims "that the summons and complaint were delivered to an incorrect address"; apparently, the summons and Complaint were mailed to the address of "Staff Counsel," a company of which Sacks Dewrell used to be the president, although she no longer is involved with that company and Staff Counsel was not using that address at the time that the summons and Complaint were mailed to that address.  (*Id.*)   Based on all of this, the defendant contends that the issue of whether the plaintiff secured proper service under Fed. R. Civ. P. 4(h) is disputed and summary judgment is also precluded on that ground.  (Docket No. 28 at 21-22.)  In response, the plaintiff does not attempt to apply any sort of Rule 4 analysis or explain why its service in this case was proper, only briefly arguing, in essence, that DS must have received the Complaint in this case and, therefore, it had sufficient notice of the dispute.  (Docket No. 29 at 21-22.)  Service of process issues often involve a complicated interplay of Rule 4, state and federal law, and the facts of the case.  *See e.g. Prunte v. Universal Music Group*, 248 F.R.D. 335, 338 (D.D.C. 2006)("actual notice cannot cure otherwise defective service."); *Hatami v. Kia Motors Am.*, 2008 WL 4748233, *1 (C.D. Cal. Oct. 29, 2008)(discussing that each service of process case can only be resolved by considering the totality of each situation).  Neither side has sufficiently developed the record on this issue or appropriately briefed the matter with controlling authority.  That said, the court believes that this is not a particularly strong affirmative defense for the defendant.

### 1.     The Franklin and Dayton Closings

The plaintiff argues that the defendant's failure to timely record the Franklin and Dayton deeds of trusts amounts to a breach of DS's agreement to "receive and process applications for title insurance in a timely, prudent and ethical manner with due regard to recognized title insurance underwriting practices and in accordance with the rules and instructions of [Chicago Title]."  (Docket No. 19 at 20; *see also* Docket No. 1 Ex. B at 1.)  In support of this position, the plaintiff cites a few statutes and cases, none of which are directly on point, for the prospect that agents generally have a duty to timely record documents such as deeds of trust and mortgages. (Docket No. 19 at 20-21 citing, *e.g.*, *Associates Home Equity Servs. v. Franklin Nat. Bank*, 2002 WL 459007, *1-2 (Tenn. Ct. App. 2002)).  The plaintiff also relies on the declaration of its expert, James Ortale, and on the similar declaration of its "chief recoupment counsel," Philip McGargill, for the proposition that such recording delays are not "timely," "prudent" or in accordance with recognized underwriting practices or the rules and instructions of Chicago Title. (*See e.g.* Docket No. 21 at 2-3; Docket No. 22 at 5.)

While DS points out that Chicago Title has not come forth with a specific company rule

Generally, "[i]f service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, the court, upon motion or on its own initiative, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time." *Bridgeport Music, Inc. v. Rhyme Syndicate Music*, 376 F.3d 615, 623 (6th Cir. 2004) (citing Fed. R. Civ. P. 4(m)).  Here, the defendant answered the Complaint on January 8, 2009, about 60 days after the Complaint was served, and, from the Answer, it is obvious that the plaintiff had received the Complaint.  (Docket No. 7.)  Moreover, the defendant elected not to further develop the record on this issue either by filing a motion to dismiss or a motion for summary judgment on this point, which further demonstrates the difficulty the defendant will have advancing this argument.

that was violated by the specific recording delays, DS does not dispute that, absent an excuse, such delays in recording would likely be unreasonable and could violate DS's obligations under the Agency Contract.  (Docket No. 28 at 14.)  Instead, the defendant, relying largely on the declaration of Ms. Sacks Dewrell, contends that the delays in recording were not the fault of DS, but rather, under the "special arrangement" discussed above, Ameriquest was permitted, by both parties to the Agency Contract, to collect and retain the closing documents at closing, and DS was at the mercy of Ameriquest as to when it would receive those documents.  (*See* Docket No. 28 Ex. 3 at 7, 10.)  Indeed, Ms. Sacks Dewrell contends that, for both the Franklin and the Dayton closings, DS recorded the deeds of trust "promptly upon our receipt of the documents from Ameriquest" and "as soon as they were received."  (*Id.*)

In reply, as to the Franklin Closing, the plaintiff points to the closing instructions, discussed above, "which bear the signature of Mara Sacks [Dewrell] and reflect on their face the date of September 14, 2004" and also state "Record Enclosed Documents . . . Deed of Trust/Mortgage."  (Docket No. 29 at 3, 6, 14-16.)  As to both the Franklin and Dayton closings, the plaintiff points to additional language in the closing instructions that mandated that the lien was to be recorded in the "First Position" and that instructed the title agent to contact Ameriquest if DS was unable, at the time of recording, to comply with the instructions.  (*Id.*)  The plaintiff reiterates that it was DS's responsibility, not Ameriquest's, to ensure that the deeds of trust were timely recorded and it, again, points to the testimony of its expert and its recoupment counsel for support of what would amount to "timely" recording.  (*Id.* at 14-16.)

The dispute about when DS actually had access to the relevant closing documents

precludes summary judgment for the plaintiff here.  The defendant has brought forth essentially uncontroverted evidence that Chicago Title permitted a system by which Ameriquest, instead of DS, would collect and retain closing documents, and it is not difficult to see how this system could lead to delays in recording those documents, given that this system set up another layer in the recording process, as Ameriquest had to deliver documents to DS.

While the plaintiff does produce the September 14, 2004 closing instructions that state that the deed of trust was enclosed with those instructions, the plaintiff has failed to produce any evidence (such as a cover letter or affidavit from an Ameriquest representative) showing that the deed of trust was actually attached to the closing instructions.  Indeed, these closing instructions for both the Franklin and Dayton closings have a space for Ameriquest to indicate a date for recording, and, on both documents, the date field is left blank.  (Docket No. 22 Exs. 2 and 19.) Also, there is nothing in the record that suggests any other explanation for the delay in the recording of these two deeds of trust other than that they were Ameriquest deeds of trust subject to an extra level of bureaucracy.   In light of this continuing, genuine dispute as to when DS actually received the closing documents connected to the Franklin and Dayton closings and the lack of a clear factual record as to the dynamics of the relationship between Ameriquest, DS, and Chicago Title, the court cannot conclude, as a matter of law, that the defendant breached the Agency Contract by not recording the relevant closing documents in a more timely manner.  This will be an issue for trial.[4]

---

[4]There are some other issues as to these closings.  First, as to the Dayton Closing, the plaintiff claims that DS "backdated" the title policy to January 24, 2004, whereas the deed of trust was not actually recorded until October 2004.  (Docket No. 28 Ex. 1 at 22.)  DS denies that

### 2. The Smithville Closing

As discussed above, the plaintiff contends that it has established, as a matter of law, that the defendant breached the Agency Contract by not including the proper legal description of the Smithville property in the deed of trust that was provided to Ameriquest. (Docket No. 19 at 7.) The plaintiff goes on to allege that it spent $4,000 to correct the problem. (*Id.* at 7-10.) The plaintiff cites no legal support for the proposition that failing to include a complete legal description of the property in the deed of trust would be a violation of DS's contractual obligations here, but, again, it relies on its expert and recoupment counsel to argue that such conduct violates "usual, customary and recognized practice and procedure in the title insurance industry in the State of Tennessee" and also Chicago Title's "rules, policies, procedure and expectations for its agents." (*Id.* at 22.)

In response, the defendant does not challenge that such an omission likely violates DS's obligations under the Agency Contract. Rather, DS claims that Chicago Title has not established the "reasonableness or necessity of the expenses" claimed. (Docket No. 28 at 12, 22.) Specifically, in her declaration, Ms. Sacks Dewrell contends that the omission of some of the Smithville property on the deed of trust amounted to a "scrivener's" error that could have been

---

any documents were "backdated." (*Id.*) This dispute does not appear particularly relevant to the outstanding breach of contract issues, although it is notable that, inconsistent with the allegations of "backdating," the Franklin property title policy also appears to have been issued in conjunction with the sale and the closing, as opposed to in conjunction with the recording. (See Docket No. 22 Ex. 4.) Additionally, through the declaration of Ms. Sacks Dewrell, the defendant challenges the reasonableness of the $15,854.35 in expenses that the plaintiff claims were necessary to settle the claims as to the Franklin property. (Docket No. 28 Ex. 3 at 8.) The issue of damages will be resolved at trial, if the jury concludes that the Agency Contract was breached as to the Franklin property.

easily corrected, and "general practice allows the closing attorney the opportunity to prepare a corrective instrument." Moreover, she claims that "the change [required here] was relatively minor and easily accomplished." (Docket No. 28 Ex. 3 at 8.)

Therefore, as to the Smithville property, there appears to be no dispute that failing to include the correct property description is a responsibility of the title agent under contracts such as the one that was in place here, and DS, essentially without excuse, did not include the correct description. That said, there remains a genuine issue of fact as to damages.

It is well established in Tennessee that a party injured by a breach of contract has a duty to exercise reasonable care and diligence to minimize its damages, and one cannot recover for damages incurred by not exercising this reasonable care and diligence. *Cook & Nichols, Inc. v. Peat, Marwick, Mitchell & Co.*, 480 S.W.2d 542, 545 (Tenn. Ct. App. 1971). The defendant contends that, for little cost, it could have easily corrected the omission on the deed of trust. The plaintiff, on the other hand, has failed to come forward with any detail as to why this omission cost $4,000 to correct. Indeed, in his deposition, recoupment counsel Philip McGargill was asked "do you know with respect to the Smithville property what was done to correct the legal description for $4,000"? To this question, McGargill responded, "I do not."[5] (Docket No. 31 Ex. 1 at 144.) While the plaintiff has filed the $4,000 check it issued to a law firm in conjunction

---

[5] The defendant generally objects to reliance on the declarations and testimony of the plaintiff's witnesses, Mr. McGargill and Mr. Ortale, as to the facts of this matter because Mr. Ortale is offered as an expert witness who was not personally involved in any of the transactions at issue and because Mr. McGargill was not employed by Chicago Title prior to 2008, and, therefore, lacks personal knowledge of the facts. (*See* Docket No. 28 at 7-13.) Ultimately, as can be seen herein, these arguments have little bearing on the outcome of the pending motions.

with settling this matter, further evidence of how $4,000 in expenses were incurred to correct this mistake appear unavailable.  Therefore, as to the Smithville property, the issue of the precise amount of damages that were reasonably incurred as a result of DS's breach remain subject to reasonable dispute.

### 3.    The Jamestown Closing

As to the Jamestown Closing, the plaintiff claims that the defendant simply neglected to pay off a more senior lien on the property prior to issuing the title insurance policy to Ameriquest in May 2004.  (Docket No. 19 at 14.)  As discussed above, the plaintiff has filed various documents indicating that the senior lien was recorded and, therefore, would have been apparent to title searchers prior to the Jamestown Closing and that DS, due to a misinterpretation of a letter by a paralegal, operated under the mistaken impression that the more senior lien had already been paid off.  Also, as discussed above, the plaintiff has submitted evidence that it was forced to pay $81,000 under the title policy issued on its behalf by DS.  (Docket No. 22 Ex. 35.)

As with the Smithville property, the plaintiff does not cite any law in support of its breach argument here.  Rather, the plaintiff relies on the declarations of its recoupment counsel and its expert for the proposition that "Dewrell Sacks' failure to subordinate, disclose or otherwise payoff or secure the release of the [senior lien] or, in the alternative, failure to list the [senior lien] as an exception to coverage in the Jamestown Loan Policy, are improper and violate not only usual, customary and recognized practice and procedure in the title insurance industry in the State of Tennessee, but also violate Chicago's rules, policies, and procedure and expectations for its agents."  (Docket No. 19 at 22.)

The defendant's response here is weak and somewhat confusing. The defendant vaguely states that "plaintiff improperly settled the claim." (Docket No. 28 at 20.) That is, the defendant alleges that "Ameriquest disbursed money without verifying release" of the senior lien. (*Id.*) Therefore, the defendant argues, Chicago Title should not have paid Ameriquest because the whole title issue was really Ameriquest's fault. (*Id.*)

Ms. Sacks Dewrell's affidavit provides little more substance. She denies that the problem here was caused by a paralegal misinterpreting a letter, but she claims, rather, that an abstractor, Services Management Company of Tennessee, provided an abstract of title for DS and that abstract of title failed to advise DS that there were two deeds of trust on the property, and, therefore, DS only paid off one of the deeds of trust, problematically leaving a second, senior lien. (Docket No. 28 Ex. 3 at 9.) Therefore, she claims, DS acted reasonably throughout the Jamestown Closing, and the fault here lies with an abstractor whom Chicago Title tacitly approved of DS using. (*Id.*)

These are not convincing arguments. First, DS has apparently provided no documentary evidence in support of this abstractor error. Moreover, while DS attempts to blame Ameriquest or a third-party title abstractor for the senior lien issue, as to Chicago Title's damages, the Agency Contract explicitly places the responsibility for this error on DS. For instance, the Agency Contract states that DS is liable for the "errors and/or omissions in the abstracting or examination of title by [DS] or [DS's] employees and/or subcontractors . . . ." (Docket No. 1 Ex. B. at 2.) Therefore, under the agreement of the parties, even crediting DS's *post hoc* explanations for the mistake, DS is liable to Chicago Title for its errors and for the errors of its

abstractors that amount to breach of the Agency Contract. As with the Smithville property, the plaintiff has shown breach of the Agency Contract.

### 4. Damages/Offset

As noted above, the defendant contends that any recovery by the plaintiff here is subject to an "offset" of $33,374.36. (Docket No. 28 at 21.) In her declaration, Ms. Sacks Dewrell explains that this money consists of "outstanding rebates for premiums on policies issued on behalf of [Chicago Title]." (Docket No. 28 Ex. 3 at 10-11.) Attached to Ms. Sacks Dewrell's declaration is a letter she apparently sent to Chicago Title in August 2007 (well in advance of this litigation), demanding the return of this money. (*Id.* at 12.)

The "burden of proving an offset should lie with the defendant." *United States v. Elson*, 577 F.3d 713, 734 (6th Cir. 2009). In support of its position that the defendant has not sufficiently met its burden here, the plaintiff points to the deposition testimony of Mr. McGargill, who testified that DS has not permitted Chicago Title to do an audit "to verify if there were any funds due and owing." (*Id.* at 19 citing Docket No. 31 Ex. 1 at 62-63.) Perhaps sensing that there is a clear issue of fact here, the plaintiff argues that, "in the event of an offset, such a credit would not preclude the entry of summary judgment against Dewrell Sacks, but would merely reduce the amount of Chicago's award." (*Id.*)

Therefore, the present nature of the proof as to the claim for an offset is that the defendant has submitted sworn testimony and evidence indicating that it has been demanding these premiums for more than two years, and the plaintiff does not deny that premiums may be owed, but it contends that it has not been permitted to independently determine what the amount

owed might be.  Clearly, while the defendant will have the ultimate burden of proving an offset, at this stage, clear issues of fact preclude summary judgment in the plaintiff's favor on this point.

### 5.    Summary

As to the Franklin and Dayton closings, there remains a genuine issue of fact as to whether the delays in recording were DS's responsibility, and, therefore, the plaintiff has not proven breach (or damages) as a matter of law.  The plaintiff has established that, as to the Smithville and Jamestown closings, DS committed errors in issuing the title policies in those cases that amount to breaches of the Agency Contract.  While the $4,000 in damages for the Smithville matter remains the subject of reasonable dispute, there does not appear to be any reasonable dispute that Chicago Title sustained $81,000 in damages in conjunction with settling the Jamestown matter.  That said, a judgment of any amount in favor of Chicago Title would be inappropriate at this time, as issues regarding a potential offset and other affirmative defenses could potentially affect the scope of liability.[6]

---

[6]The plaintiff also seeks attorneys' fees and prejudgment interest.  (Docket No. 19 at 23.) As to attorneys' fees, the plaintiffs points to a clause in the Agency Contract that states: "[i]f either party shall institute an action against the other party for breach of this contract, the unsuccessful party shall pay court costs and reasonable attorney's fees to the successful party." (Docket No. 1 Ex. B at 2.)  As Chicago Title recognizes, filings in conjunction with its precise claim for attorneys' fees and prejudgment interest can only be made after there is a judgment in this case.  (Docket No. 19 at 23.)

## **CONCLUSION**

For the reasons discussed herein, the defendant's Partial Motion for Summary Judgment will be granted, and the plaintiff's negligence claim will be dismissed. As to the plaintiff's Motion for Summary Judgment, while the plaintiff has demonstrated that DS breached the Agency Contract as to at least two of the four closings at issue, the issue of breach as to the other two closings and the precise measure of damages remain outstanding.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge